**In the United States District Court**
**for the District of Kansas**

———————

Case No. 22-cv-02362-TC-RES

———————

DENNIS I. HULSING,

*Plaintiff and Counter Defendant*

v.

DANIEL J. LARIMER,

*Defendant and Counter Claimant*

———————

**MEMORANDUM AND ORDER**

Plaintiff Dennis Hulsing and Defendant Daniel Larimer disagree about whether their settlement agreement still requires Hulsing to pay Larimer roughly $6 million or whether the $3 million he has paid satisfied their agreement. Doc. 1. Invoking Fed. R. Civ. P. 12(c), both parties have moved for judgment on the pleadings. Docs. 9 & 14. For the following reasons, Hulsing's motion is granted and Larimer's motion is denied.

**I**

**A**

Rule 12(c) motions are appropriate "[a]fter the pleadings are closed," which means "upon the filing of a complaint and answer." *Progressive Cas. Ins. Co. v. Estate of Crone*, 894 F. Supp. 383, 385 (D. Kan. 1995); *see* 5C Wright & Miller, *Federal Practice & Procedure* § 1367 (3d ed. 2021). The standard applicable to Rule 12(c) is identical to that for a motion to dismiss under Rule 12(b)(6). *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). To survive a motion to dismiss, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Evaluating a motion to dismiss is a two-step process. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *see also Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). First, the Court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Iqbal*, 556 U.S. at 678–80. Second, the Court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A claim need not be probable to be considered plausible. *Id.* But the facts, viewed in the light most favorable to the claimant, must adduce "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

The same analysis applies when both parties move for judgment on the pleadings. *Atl. Specialty Ins. Co. v. Blue Cross & Blue Shield of Kansas, Inc.*, --- F. Supp. 3d ---, No. 18-2371-DDC-ADM, 2023 WL 2648223, at *8 (D. Kan. Mar. 27, 2023). Cross motions for judgment on the pleadings "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Mercury Sys., Inc. v. S'holder Representative Servs., LLC*, 820 F.3d 46, 51 (1st Cir. 2016) (citation and internal quotation marks omitted). This analysis is "similar to that used for cross-motions for summary judgment." *Id.* (citing *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)). As in the summary judgment context, "the denial of one" motion for judgment on the pleadings "does not require the grant of another[.]" *See Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted) (analyzing cross motions for summary judgment).

2

**B**

The substance of the parties' claims stems from a settlement agreement that was formed to conclude a prior lawsuit between them. The following describes the factual and procedural history of these two lawsuits and the parties' current contentions.

**1.** The relevant facts are largely undisputed. The parties entered a "convertible note purchase agreement." Doc. 10 at 2.[1] Under that agreement, Larimer expected nearly $9 million in additional payments from Hulsing; Hulsing disagreed for reasons that do not appear in the pleadings. Doc. 1-1 at 1. The parties litigated this disagreement in North Carolina state court. Doc. 1 at ¶ 8.

In August 2022, the parties entered into an amended settlement agreement, Doc. 1-2, resolving the prior litigation. Doc. 1 at ¶¶ 9–10; Doc. 7 at ¶¶ 9–10. Pursuant to that agreement, the parties also entered into a confessed judgment promissory note. Doc. 1 at ¶ 12 (referring to Doc. 1-3); Doc. 7 at ¶ 12 (same). Under the note, Doc. 1-3, Hulsing agreed to pay $3 million by an initial payment of $500,000 due December 31, 2022, followed by monthly installments over 36 months. Doc. 1 at ¶ 11; Doc. 7 at ¶ 11. Those monthly payments would begin on September 1, 2022, and end on August 1, 2025. Doc. 1-3 at 1. The note provided that interest would accrue from the date of the note's execution at the rate of 2.55% per year. *Id.* at 2.

The parties' dispute concerns Hulsing's failure to make the September 1, 2022 payment. They agree that Hulsing made the initial payment of $500,000, as required under the amended settlement agreement, on August 29, 2022. Doc. 1 at ¶ 14; Doc. 7 at ¶ 14. But he then failed to make his first monthly payment on September 1. Doc. 10 at 3.

On September 8, 2022, Larimer delivered to Hulsing a notice of default. Doc. 1 at ¶ 15; Doc. 7 at ¶ 15; Doc. 8 at ¶ 10. That notice stated that Larimer was "accelerat[ing] the Note and declar[ing] the outstanding principal amount of the Note (as amended automatically by Section 8 of the Note) . . . immediately due and payable" as pro-

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

vided in Section 9 "Remedies." Doc. 7-2 at 2, Doc. 1-3 at § 9. That amount is $9,174,123.35. Doc. 1-3 at § 8.

The following day, September 9, 2022, Hulsing sent Larimer $2.5 million via wire transfer. Doc. 1 at ¶ 16; Doc. 7 at ¶ 16. Hulsing also requested that Larimer confirm that the note was paid in full. Doc. 1 at ¶ 18; Doc. 7 at ¶ 18; Doc. 1-4. Larimer refused to do so. Doc. 1 at 19; Doc. 7 at ¶ 19.

Hulsing filed this suit, seeking declaratory judgment that the note is "paid in full by virtue of Hulsing's payments to Larimer totaling $3 million." Doc. 1 at 6–7. Larimer filed a counterclaim asserting that "Hulsing materially breached the [n]ote due to the [d]efault" and seeks judgment of more than $6 million—*i.e.*, the default amount less the $3 million Hulsing has paid. Doc. 7 at 7–8.

**2.** The parties' dispute centers around the terms of a written agreement entitled "Confessed Judgment Promissory Note." They disagree both about which provisions are relevant and what those provisions mean in light of the aforementioned factual background.

Section 1 concerns payment. Section 1(a) outlines the payment schedule and clarifies Hulsing's obligation to make "[a] separate payment of Five Hundred Thousand Dollars" on or before "December 31, 2022." Doc. 1-3 at 1. Section 1(b) governs prepayment. It reads:

> Prior to an Event of Default, the Maker [Hulsing] may prepay the Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

Doc. 1-3 at § 1(b). Section 1(c) deals with payment dates—for example, when payments are made if they come due on a weekend. Doc. 1-3 at § 1(c). Section 1(d) concerns "payment in full." Doc. 1-3 at § 1(d). The payment in full provision reads:

> This Note is due in full on or before August 1, 2025; *provided, however*, this Note shall be deemed paid in full if on or before 1:00 p.m. on December 31, 2022 [Hulsing] has delivered to [Larimer] Three Million Dollars ($3,000,000.00), including the payment of Five Hundred Thousand Dollars ($500,000.00) pursu-

4

> ant to the certain Settlement Agreement dated August 12, 2022 by and among [Hulsing], [Larimer], and Earth Fare 2020, Inc., a North Carolina corporation ("Earth Fare"), as amended August 26, 2022 (the "Settlement Agreement").

Doc. 1-3 at § 1(d) (emphasis in original). Finally, Section 1(e) addresses the mechanics of payment under the note—for example, the order in which a payment will be applied to debts. Doc. 1-3 at § 1(e).

Sections 6 through 8 of the note concern default. Section 6 clarifies that "[t]he occurrence of any one or more of the following events shall constitute an event of default…under the terms of this Note[.] Doc. 1-3 at § 6. There are three events listed. One, in Section 6(a), concerns nonpayment:

> The failure of the Maker [Hulsing] to pay to the Noteholder [Larimer] when due any and all amounts payable by the Maker to the Noteholder under the terms of this Note, which payment failure is not cured within five (5) calendar days of the original due date of such payment.

Doc. 1-3 at § 6(a). The next, Section 6(b), provides for events of default related to bankruptcy and insolvency. Doc. 1-3 at § 6(b). The third and final one is contained in Section 6(c). It states that it is an event of default if "[t]he Maker fails to give notice of an Event of Default …." Doc. 1-3 at § 6(c).

Section 8 of the Note, "Amount Due in the Event of Default," is the focus of Larimer's argument. It provides as follows:

> [Hulsing] acknowledges that the Note is issued in accordance with the terms of the Settlement Agreement, wherein [Hulsing] agreed to purchase certain promissory notes held by [Larimer] (the "Existing Noteholder Notes") and that this amount represents significantly less than would be due under the Existing Noteholder Notes[.] [Hulsing] agrees that the amount due to [Larimer] under the Existing Noteholder Notes is in excess of the sum of Eight Million Eight Hundred Sixty-Four Thousand Three Hundred Two Dollars ($8,864,302.00). Upon the occurrence of an Event of Default, the original principal balance of

> this Note shall automatically, without any further action of [Hulsing] or [Larimer], be amended to be the sum of (a) Nine Million One Hundred Seventy-Four Thousand One Hundred Twenty-Three Dollars and Thirty-Five Cents ($9,174,123.35) (the "Default Amount") and (b) any amounts due to [Larimer] pursuant to Section 12 hereof. [Hulsing] hereby acknowledges that the provisions of this Section 8 are a conditions precedent [sic] to [Larimer] issuing this Note, and [Hulsing] has read and fully understands the provisions of this Section 8 and the consequences of an Event of Default.

Doc. 1-3 at § 8. Larimer refers to this provision as a carrot-and-stick. Doc. 13 at 7.

Section 20 enables Larimer to seek a confession of judgment in the event of a default. Specifically, it explains that Hulsing authorizes Larimer, "after the occurrence of any event of default," to "confess judgment against him [Hulsing] in favor of the noteholder [Larimer]…for the indebtedness due hereunder, including without limitation, the default amount, all accrued and unpaid interest, and all other amounts due hereunder[.]" Doc. 1-3 at § 20.

**3.** The parties have submitted competing motions for judgment on the pleadings. Hulsing argues that judgment on the pleadings in his favor is proper because the "plain language of the Note makes clear that it 'shall be deemed paid in full'" if Hulsing has delivered $3 million to Larimer before December 31, 2022, and the parties do not dispute that those two conditions were satisfied. Doc. 10 at 8–9 (quoting Doc. 1-3 at 1). Hulsing further argues that nothing in the Note indicates that the paid-in-full provision is terminated by an event of default. *Id.* at 10.

Larimer, on the other hand, asserts that Hulsing's failure to make his first payment on September 1, 2022 constituted an "Event of Default," as set forth in Section 6(a) and, as a result, Section 8 automatically increased the principal balance of the Note to more than $9 million. Doc. 15 at 5. Thus, Larimer contends that Hulsing cannot cure his default and "the automatic amendment of the Note" by making a partial payment. *Id.* at 6. Doing so, according to Larimer, would produce the absurd result that Hulsing could miss payments and suffer

6

no penalty of the automatic increase so long as he did so before December 31, 2022. Doc. 13 at 8.

## II

Hulsing was in default by failing to make the first scheduled payment. But his subsequent payment of $3 million satisfied his obligation under the Note. As such, Hulsing's motion for judgment on the pleadings is granted and Larimer's is denied.

### A

Kansas law governs the parties' dispute.[2] In Kansas, the interpretation of contracts presents a pure question of law. *See First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998); *Fed. Land Bank of Wichita v. Krug*, 856 P.2d 111, 114 (Kan. 1993). And "the primary rule in interpreting written contracts is to ascertain the intent of the parties" based on the plain, general, and common meaning of the words they used within the contract's four corners. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1186–87 (10th Cir. 2018) (applying Kansas law). If the terms of the contract are unambiguous, the court considers only the plain language of the contract without applying rules of construction. *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 56–57 (2012) ("Scalia & Garner"). "When possible, a court ascertains the parties' intent . . . construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Iron Mound, LLC v. Nueterra Healthcare Mgmt., LLC*, 313 P.3d 808, 812 (Kan. 2013); Scalia & Garner 180–82 ("The harmonious-reading canon is just as applicable to contracts as it is to statutes."). And "[r]easonable rather than unreasonable interpretations of contracts are favored, and accordingly, interpretations which lead to absurdity or negate the purpose of the contract should be avoided. *Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, LLC*, 381 F.3d 1039, 1044–45

---

[2] The Note expressly identifies Kansas law to govern this dispute, Doc. 1-3 at § 16, and the parties sue on the Note, *see* Doc. 10 at 7; Doc. 15 at 4 n.1; *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding forum state's choice of law rules apply in diversity jurisdiction cases); *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1194 (10th Cir. 2004) (observing that "Kansas generally recognizes [] contractual choice-of-law provisions").

(10th Cir. 2004) (citation and internal quotation marks omitted); *see also* Scalia & Garner 234–36.

**B**

Under the terms of the Note, Hulsing's payments—totaling $3 million—constituted full satisfaction of his entire obligation under the Note. Doc. 1-3 at § 1(d). Section 1(d) states that the note "shall be deemed paid in full if on or before 1:00 p.m. on December 31, 2022 [Hulsing] has delivered to [Larimer] Three Million dollars[.]" Doc. 1-3 at § 1(d).

The parties agree that Hulsing paid Larimer $500,000 on August 29, 2022 and $2.5 million on September 9, 2022. They only disagree about whether that was the amount owed at the time of payment. It was. Nothing in the text of Section 1(d) made "payment in full" expressly conditional on the absence of an event of default.

Larimer contends that Hulsing cannot rely on Section 1(d)'s full-satisfaction provision for four reasons. None are persuasive.

*First*, he argues that because Hulsing defaulted on his September 1, 2022 installment payment, the amount due became over $9 million. Doc. 7 at ¶ 7–13. There appears to be no dispute that a default occurred. Under the terms of the Note, one of the three listed events of default is non-payment of an amount due and owing. Doc. 1-3 at § 6(a). There is no factual dispute that Hulsing failed to make the first scheduled payment on September 1, 2022, failed to timely cure, and that this constituted an event of default.

There also appears to be no dispute that the event of default caused the principal amount to be automatically amended to over $9 million. Section 8 identifies the consequence of a default. In material part, it states that "the original principal balance of this Note shall automatically, without any further action on the part of [Hulsing] or [Larimer], be amended to be the sum of [] Nine Million One Hundred Seventy-Four Thousand One Hundred Twenty-Three Dollars and Thirty-Five Cents ($9,174,123.35) (the 'Default Amount') and [] any [expenses] due to of Larimer." Doc. 1-3 at § 8. And in order to collect, Section 20 contained a "Confession of Judgment" provision that authorized collection of, among other things, "the Default Amount." *Id.* at § 20 (cleaned up). In other words, the amount that

8

Larimer could collect automatically tripled from the negotiated amount of $3 million to more than $9 million.

Larimer's argument is essentially that it makes no sense for Hulsing to pay off a $9 million debt with a $3 million payment. Doc. 13 at 7. But the job of a court interpreting the parties' contract is to apply the document as written, not to recalibrate the agreement in a way that one party now claims makes sense. *See Iron Mound, LLC v. Nueterra Healthcare Mgmt., LLC*, 313 P.3d 808, 812 (Kan. 2013). The Note obligated Hulsing to make specified installment payments, created a unique opportunity to pay in full prior to the end of 2022, and identified procedures for the amount of the principal in the event of a default should Larimer be forced to collect the debt. It also created a procedure for ordinary prepayments, at any time, including prepayment of the entire Note. Doc. 1-3 at § 1(b).

The Note did not, however, tie the term "payment in full" to any specific dollar amount—whether the original amount or the automatically converted principal amount of more than $9 million. Instead, it simply stated that "this Note shall be *deemed* paid in full if on or before 1:00 p.m. on December 31, 2022 [Hulsing] has delivered to [Larimer] Three Million Dollars ($3,000,000.00) . . . ." Doc. 1-3 at § 1(d) (emphasis added). By using the word deemed, the parties appear to anticipate that the $3 million amount would be accepted in lieu of the much larger principal amount. The parties could have connected Section 1(d) to the balance of the Note. That they did not do so undermines Larimer's argument. *See Boucek v. Boucek*, 305 P.3d 597, 604 (Kan. 2013) ("[I]f the language of a written instrument is clear, it should be carried out as written."); *Quenzer v. Quenzer*, 587 P.2d 880, 882 (Kan. 1978) ("Words cannot be written into a contract which import an intent wholly unexpressed when it was executed.").

This result is not absurd. *Contra* Doc. 13 at 7-8. As Larimer observes, the parties' agreement was, in essence, a "carrot and stick approach" to encourage Hulsing "to make timely and/or early payments." Doc. 13 at 7. If Hulsing pays early, he receives a discount in the form of avoided interest. *Id.* If he fails to make timely payments, the original principal amount is automatically increased and Larimer may seek a confession of judgment for that amount. *Id.* To avoid that result, Hulsing may rush to exercise Section 1(d). And that is what happened here: Hulsing, had he made timely installment payments, could have taken until the end of 2025 to satisfy the Note. But because he missed a payment, he was forced to pay three years earlier.

9

*Second*, Larimer argues that the event of default eliminated the payment-in-full option in Section 1(d). Doc. 13 at 8. In particular, he points to Section 1(b), which concerns pre-payment. *Id.* It reads as follows: "Prior to an Event of Default, [Hulsing] may prepay the Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment." Doc. 1-3 at § 1(b).

Larimer argues that Hulsing's interpretation creates an absurdity because it allows him to "prepay the Note ahead of the Payment Schedule after an Event of Default…despite unambiguous language that Hulsing may only prepay **prior** to an Event of Default." Doc. 13 at 9 (emphasis original) (referring to Section 1(b) prepayment). In other words, "the only way [Hulsing] can make a payment above his monthly payments is by pre-paying the balance." Doc. 20 at 3.

But "payment in full" under Section 1(d) is not an ordinary "pre-payment." Hulsing may prepay the principal "in whole or in part," but can only "pay[] in full" for $3 million. Doc. 1-3 at §§ 1(b), 1(d). Moreover, it is impossible to exercise Section 1(d) after December 31, 2022, but prepayments—including those that satisfy the Note—remain possible at any time before August 1, 2025. *Id.*

Section 1(d) and Section 1(b) are distinct. The plain purpose of Section 1(d) is to permit a specific payment "ahead of the Payment Schedule," Doc. 13 at 9, one that satisfies Hulsing's entire obligation under the Note. Since Section 1(d) is a unique mechanism, not a mere Section 1(b) "prepayment," it does not expire if Hulsing defaults and thereby triples his obligation under the Note. So long as he exercises Section 1(d) according to its terms, his $3 million payment "deem[s]" the Note "paid in full." Doc. 1-3 at § 1(d).

The language the parties used, the overall structure of the Note, and Kansas law confirm this interpretation. In Kansas, the text of the parties' agreement should be enforced as written, harmonizing all parts with each other, declining to isolate any one provision from the agreement as a whole, and refusing any request to impute language not used by the parties. *See Iron Mound, LLC v. Nueterra Healthcare Mgmt., LLC*, 313 P.3d 808, 812 (Kan. 2013); Scalia & Garner 180–82 ("The harmonious-reading canon is just as applicable to contracts as it is to statutes."). And looking at that text, nothing in Section 1(d)—

unlike in Section 1(b)—makes its application dependent on the absence of a default.

Two canons of construction individually and collectively undermine Larimer's contrary position. One is known as the omitted-case canon, or *casus omissus pro omisso habendus est*. *See In re San Luis & Rio Grande R.R, Inc.*, 634 B.R. 599, 627 (Bankr. D. Colo. 2021) (citing Scalia & Garner at 93). The principle is simple: a matter not covered cannot be supplied by the courts. *Id.* at 627–28 (rejecting argument that a condition should be imputed into the language of railroad rules and citing an Eighth Circuit case that did the same thing for the same reason); *accord* Scalia & Garner at 93–94. Yet that is effectively what Larimer seeks—appending a condition into a provision that the parties chose not to adopt. Doing so exceeds a court's role under Kansas law. *See Trear v. Chamberlain*, 425 P.3d 297, 303 (Kan. 2018) ("It is not within the province of a court to reform an instrument by rejecting words of clear and definite meaning and substituting others.").

The other is the "so-called scope-of-subparts canon." It teaches that material within an indented subpart relates only to that subpart. *Southern Furniture Leasing, Inc. v. YRC, Inc.*, 989 F.3d 1141, 1147–48 (10th Cir. 2021) (citing Scalia & Garner). Scalia and Garner point to the Supreme Court's decision in *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005), as an example of this canon. Scalia & Garner at 157. In *Jama*, the Supreme Court rejected an attempt to impute a condition from subsection (vii) of a statute into subsection (iv) of the same statute. Not only did the Supreme Court recognize that it should not assume the omission was an invitation to impute the unstated condition, but it also noted that the subparts at issue confirmed they should each be read separately: "Each clause is distinct and ends with a period, strongly suggesting that each may be understood completely without reading any further." 543 U.S. at 344; *see also* Scalia & Garner at 158 (suggesting that the same result should have applied even if the periods had been semicolons). Just as in *Jama*, the subparts of Section 1 of the Note may be completely understood without reading the other and show no signs of interdependence.

If anything, the structure of Section 1 suggests independence. For example, Section 1 uses romanettes for sub-provisions, which suggests that the parties knew how to unambiguously draft dependent structure. Doc. 1-3 at §§ 1(a), 1(e). Moreover, the conditional "prior to an event of default" language does not appear in the overarching

Section 1 entitled "payment." Rather, it appears only in Section 1(b). The five subsections refer to separate aspects of payments under the Section 1 umbrella. Specifically, Section 1(b) describes prepayment "in whole or in part at any time" of "the principal amount" plus interest. Doc. 1-3 at § 1(b). Section 1(d), on the other hand, allows "payment in full" by specifying an exact dollar amount—$3 million, not including interest—that must be paid prior to 1 p.m. on December 31, 2022. *Id.* at § 1(d).

The natural reading of Section 1 is that the "prior to an event of default" language relates to Section 1(b) alone. Since the two sections serve different functions, they put each other in context—but one does not override the other. *Brumley v. Lee*, 963 P.2d 1224, Syl. ¶ 3 (Kan. 1998) ("All pertinent provisions . . . must be considered together, other than in isolation, and given effect."); *see also First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998).

At base, the parties knew how to include conditions—they included one in Section 1(b), permitting prepayment only before default—but did not include such a condition in Section 1(d). That choice, as reflected by the language used, must be honored.

Larimer objects to this interpretation because it means that "an event of default would have no effect on the Payment Schedule or the amount that Hulsing was due to pay," so long as he satisfied Section 1(d). Doc. 13 at 7–8. This result, Larimer says again, "insists…on an absurdity." *Id.* Specifically, "Hulsing is not incentivized to make timely payments and is not threatened by any increase in amounts owed by his own default." *Id.* But Larimer's argument does not square with the terms of the Note. Default affects both the payment schedule and the amount due under the Note. An event of default increases the original principal balance automatically from $3 million to more than $9 million. *Id.* at § 8. And it more than triples interest rates on past due amounts from 2.55% to 10%. *Id.* at §§ 2, 3. These are strong financial reasons for Hulsing not to default. And if Hulsing defaults, the Note's penalties incentivize him to promptly pay. It is true that, if Hulsing defaults before December 31, 2022, he may exercise his option to pay the $3 million under Section 1(d). This softens the effect of default in the first few months of the Note. Still, it comes at a price: he must provide $3 million without delay. And strong incentives to pay exist throughout the life of the Note. If Hulsing defaults outside the Section 1(d) period, or fails to exercise Section 1(d) in time, the 10% "penalty interest" rate applies. Doc. 1-3

12

at § 3. By the terms of the contract, Larimer got precisely what the stiff penalties on default were likely intended to achieve: speedy rectification of default.

*Third*, Larimer contends that reading Sections 1(b) and 1(d) as meaningfully distinct "defies logic, because Hulsing could [also] argue that…a [non-default] provision would not apply to the monthly payment obligations" in Section 1(a) because "the monthly payment condition *also* does not expressly reference a 'prior to an Event of Default' condition." Doc. 20 at 3. But applying Section 1(b)'s non-default provision to Section 1(a) is unnecessary because the Note defines default as—among other things—failure to comply with Section 1(a). Doc. 1-3 at § 6. The very definition of default conditions Section 1(a) on nondefault. Section 1(a) therefore does not provide context that makes it absurd to treat Section 1(b) as distinct from Section 1(d).

*Fourth*, Larimer argues that Sections 9 and 20 make Hulsing's interpretation implausible. Section 9 clarifies that Larimer "may, at [his] option…declare the outstanding principal amount of the Note as amended automatically by Section 8 hereof…immediately due and payable without notice." Doc. 1-3 at § 9. Section 20 then provides the means of enforcing that declaration. *Id.* at § 20. So, Larimer says, Section 1(d) must be conditional on nondefault to avoid "the absurd situation where Larimer has a confessed judgment in hand" for more than $9 million "but Hulsing has paid the Note 'in full' for the lesser amount." Doc. 20 at 6.

But the more harmonious interpretation is that Section 1(d) is conditional on the nonexistence of a confessed judgment, not on non-default. In other words, a narrow conflict may exist between Section 20 and Section 1(d), but both sections can be applied as written. Larimer's reading would create disharmony where none need exist and is therefore disfavored. *Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1044 (10th Cir. 2004) ("Reasonable rather than unreasonable interpretations of contracts are favored[.]").

So it is true that "theoretically, Hulsing could have defaulted on his first payment, Larimer could have confessed judgment on Hulsing's behalf…and then Hulsing could have paid the Note pursuant to the Paid in Full Provision." Doc. 20 at 5. That hypothetical situation would pose the question whether Section 20 qualifies Section 1(d).

13

But that situation is not presented by this case. And even if Section 1(d) is conditional on non-exercise of Section 20, that fact does not affect the resolution here.

### III

For the reasons set forth above, Hulsing's motion for judgment on the pleadings, Doc. 9, is GRANTED, and Larimer's motion, Doc. 14, is DENIED.

It is so ordered.

Date:  November 27, 2023             \_s/ Toby Crouse_____
                                     Toby Crouse
                                     United States District Judge